## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ROLLER BEARING COMPANY OF
AMERICA, INC.,
     Plaintiff,

    v.

MULTICUT NORTH AMERICA, INC.,
and MULTICUT DENMARK A/S,
     Defendants.

No. 3:18-cv-1212 (SRU)

### RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Roller Bearing Company of America, Inc. ("RBC") brings this lawsuit against Multicut

North America, Inc. ("MNA") and Multicut Denmark A/S ("Multicut A/S", collectively

"Multicut" or "Defendants") alleging that Multicut breached a nondisclosure agreement with

RBC and misappropriated RBC's trade secrets in violation of state and federal law.  The dispute

relates to a project for Raytheon Company ("Raytheon"), for which RBC had built and sold to

one of Raytheon's suppliers rod end bearings engineered and designed to satisfy certain

parameters.  After Raytheon replaced the supplier with MNA, Multicut allegedly shopped for

bids for a cheaper rod end bearing manufacturer using a drawing furnished by Raytheon that

contained RBC's putative trade secret design.

Multicut has moved for summary judgment on all of RBC's claims, arguing that no

reasonable jury could find that it breached the unambiguous terms of the parties' nondisclosure

agreement nor that RBC misappropriated any trade secret.  Multicut also argues that RBC's non-

contract state law claims are preempted by the Connecticut Unfair Trade Secrets Act

("CUTSA"), and that RBC cannot establish a CUTSA violation.

For the reasons set forth more fully below, I **deny** Multicut's motion for summary judgment.

## I.    Background

### A.    Factual Background

Taken in the light most favorable to RBC, the pleadings, affidavits, exhibits, and Local Rule 56(a) statements reveal that the parties' dispute arises out of the following facts.  Unless otherwise specified, the facts are undisputed or not genuinely subject to dispute.

### 1.   *The Parties and Claims*

Plaintiff RBC is a Delaware corporation headquartered in Oxford, Connecticut that designs and manufactures precision bearings and associated parts used in relevant part in the aerospace industry.  Pl.'s Sec. Am. Compl. ("SAC"), Doc. No. 75, ¶ 4; Pl.'s 56(a)(2) Statement of Material Facts ("Pl.'s SOF"), Doc. No. 147, ¶ 71.

Starting in 2015, RBC became involved in Raytheon's Small Diameter Bomb II ("SDB II") project, for which Raytheon manufactured guided munitions launched from an aircraft on behalf of the U.S. Department of Defense.[1]  Pl.'s SOF, Doc. No. 147, ¶ 75.

Defendant MNA is a Colorado corporation headquartered in Fort Collins, Colorado.  Defs.' Ans., Doc. No. 74, ¶ 4.  Defendant Multicut A/S is a Danish corporation headquartered in Vildbjerg, Denmark (together, "Multicut").  *Id.*  Multicut manufactures machined components used in relevant part in defense and aerospace applications.

Since 2013, Raytheon has purchased manufactured components from Multicut.  Affidavit of Frank Dühring dated December 2, 2022 ("Dühring Aff."), Doc. No. 129, ¶ 4.  In 2016,

---

[1] Raytheon is not a party to this litigation.

Multicut was approached by, and then selected by, Raytheon to be the vendor manufacturing SDB II wing housing assemblies.  Defs.'s 56(a)(1) Statement of Material Facts ("Defs.' SOF"), Doc. No. 132, ¶¶ 5, 9.  The parties' dispute arises out of Multicut's efforts to secure supplies for the manufacture of wing assemblies.  RBC contends that Multicut breached the parties' nondisclosure agreement, misappropriated its trade secrets, and committed a variety of business torts in an effort to identify and secure a lower price for the rod end bearings RBC made specifically for the SDB II project.  *See generally* Pl.'s Sec. Am. Compl., Doc. No. 75.  Multicut disagrees.

### 2. *Rod End Bearings, Generally*

By way of background, a bearing is a machine element that supports mechanical parts. *See generally* Expert Report of Robert Adams ("Adams Report"), Ex. 60 to Declaration of Lorrey Leddy dated ("Leddy Decl."), Doc. No. 148-52.  Generally, bearings are either rolling element bearings, which incorporate internal rolling elements (*i.e.*, balls), or plane bearings, in which two flat surfaces slide on each other.  *Id.* ¶¶ 42, 44.  Plane bearings can carry more extreme loads, transmit higher forces, and more durably bear oscillations, small motions, and vibrations with little or no maintenance and lubrication, and suffer less wear than rolling element bearings.  *Id.* ¶¶ 52-53.  Spherical plane bearings, including rod end bearings and loader slot bearings, work via the contact of concentric spherical surfaces on the outer element ("the housing") and on the inner element ("the ball").  *Id.* ¶¶ 44, 46-47.  A rod end bearing, a spherical bearing attached to a rod, is designed to transmit force while rotating in three axes.  *Id.* ¶¶ 48-49. A loader slot bearing, a spherical bearing in which a slot in the housing allows the ball to be rotated and aligned with the slot, is designed to transmit a linear force through a spherical pivot

in a manner easing assembly and disassembly, thus improving maintenance and inspection.  *Id.*
¶¶ 47, 54.

Bearings may require sophisticated design and engineering, depending on the
requirements of their applications.  *Id.* ¶ 51.  Considerations include force, rotation angles,
rotation speeds, oscillation frequencies and durations, shelf life, and oxidation life.  *Id.* ¶¶ 51, 54-
55.  In aerospace applications, reliability, corrosion resistance, tolerance of difficult operating
conditions, and longevity are of paramount importance.  *Id.* ¶ 55.  Improper design may lead to
fretting and rust, corrosion, cracking, changes in surface shape, immobility, and failure.  *Id.* ¶¶
56-82.  Proper selection of materials, clearances, treatments, and coatings facilitate the strength,
toughness, durability, fatigue resistance, and corrosion resistance appropriate for a bearing's
application.  *Id.* ¶ 58.

### 3.  *The Relationship Between Raytheon and RBC*

RBC claims without contradiction to have worked with Raytheon in 2015 
in the SDB II program, pursuant to the parties' extant
proprietary information agreement.  Declaration of Scott McNeil ("McNeil Decl."), Doc. No.
150, ¶¶ 4-7; *see generally* Raytheon-RBC Proprietary Information Agreement, Doc. No. 142-8.
Specifically,
, Raytheon and RBC exchanged correspondence regarding the
rod end bearing identified as Raytheon part number 2296969 ("the Rod End").  Defs.'s SOF,
Doc. No. 132, ¶ 1; Dep. of John Willett ("Willett Dep."), Doc. No. 148-1, 21:21, 22:19-20,
38:12-39:2; Raytheon Report, Doc. No. 148-2, 6; Willett-Andrup Email, Doc. No. 148-4, at 2;
McNeil Drawing, Ex. 10 to Leddy Decl, Doc. No. 148-6.
Pl.'s SOF, Doc. No.

147, ¶ 76.  RBC contends that it designed a stronger and more durable customized rod end

bearing featuring a novel combination of materials and features for use in aircraft applications

with harsh environments ███████████████████████.  Pl.'s SOF, Doc. No.

147, ¶¶ 76-77, 103; McNeil Decl., Doc. No. 150, ¶¶ 4, 7.  RBC presented its ███████████

███ bearing design to Raytheon in a drawing designated as an "Alternative Proposal," which

McNeil had hand-marked as ███████████████████████████████

█████████████████████████████████ ("the McNeil Drawing").  *See*

McNeil Drawing, Ex. 10 to Leddy Decl, Doc. No. 148-6; McNeil Decl., Doc. No. 150, ¶ 7.

According to RBC, its design ████████████████████████████████

███████.  First, RBC selected for the ball material ████████████████████████

██████████████████████████████.  Pl.'s SOF, Doc.

No. 147, ¶ 34.  Second, RBC selected for the housing material █████████████████

██████████████████████████████████████████████

███████████████████████████████.  *Id.*  Third, RBC selected a

████████████████████████████████.  *Id.*  Fourth, RBC selected █████████

████████████████████████████████.  *Id.*  Fifth, RBC selected

to ████████████████████████████████████████████

██████████████████  *Id.*; *see also* Adams Report, Doc. No. 148-52, ¶ 65-66.  RBC

identifies two patents awarded by the U.S. Patent and Trademark Office, the claims of which

allegedly embody RBC's trade secret design for the Rod Ends: U.S. Patent Nos. 10,788,073 and

11,441,604.  Exs. 1 and 2 to Leddy Decl., Docs. No. 146-1 and 146-2.

After Raytheon engineers tested and approved RBC's design, RBC entered into an

exclusive long-term agreement to supply the Rod Ends to the subcontractor manufacturing SDB

II wing assemblies for Raytheon at the time, Klune Industries ("Klune").  Pl.'s SOF, Doc. No. 147, ¶ 78.

During this period, Multicut was not a party to any of the communications between Raytheon and RBC, and Raytheon did not later inform Multicut that RBC engineers were involved in the development of the Rod End or the McNeil Drawing.  Dühring Aff., Doc. No. 129, ¶ 51.  Multicut thus contends, though RBC disputes, that it was unaware that ██████████ ████████████████████████████████.

### 4. *The Relationship Between Raytheon and Multicut*

In 2016, Raytheon approached Multicut about becoming a supplier for the wing housing assembly, identified as Raytheon part number 2296963.  Defs.' SOF, Doc. No. 132, ¶ 9.  By August of 2016, Raytheon had selected Multicut to produce the wing housing assembly.  *See* Pl.'s Opp'n, Doc. No. 146, at 9.

### a. The Raytheon-Multicut Proprietary Information Agreement ("Raytheon-Multicut PIA")

In furtherance of Raytheon's request for Multicut's proposal, Raytheon and Multicut A/S executed a Proprietary Information Agreement ("Raytheon-Multicut PIA") on or about July 15, 2016.  Defs.' SOF, Doc. No. 132, ¶ 6.  The Raytheon-Multicut PIA provided in relevant part that Multicut "may also disclose [Raytheon's] Proprietary Information," including drawings, "to third parties such as vendors . . . to the extent necessary in connection with the use of such Proprietary Information for the authorized purposes provided that such third parties are bound by appropriate obligations of confidentiality."  Ex. A to Dühring Aff., Doc. No. 127-1, § 6(b).  A recital in the Raytheon-Multicut PIA indicated that one purpose contemplated by the agreement was use of the

6

Raytheon Proprietary Information for the purpose of supplying a competitive proposal. *Id.* at 1.

The PIA stated in relevant part:

> [I]n connection with and for the purposes of supplying a competitive proposal and
> the potential development and production of program related metal fabrication
> and other materials; and SDB II program efforts related to the development of a
> second source of supply for various build to print metal parts as Multicut's facility
> with its unique manufacturing model may offer lower cost and higher capacity
> availability for its customers; and SDB II program efforts related to the
> development of a second source of supply for various build to print metal
> parts. . . .

*Id.*

###### b. The Raytheon Drawing

Also in furtherance of its request for Multicut's proposal, Raytheon provided Multicut

drawings for the parts required to manufacture the completed wing assembly, including a

drawing for the Rod End (the "Raytheon Drawing").  Defs.' SOF, Doc. No. 132, ¶ 10.  The

Raytheon Drawing "define[d] the selection criteria for the procurement of an externally threaded

rod end bearing," indicating the materials employed in the ball and housing, certain finishes, the

intended radial play, and certain marking requirements.  Raytheon Drawing, Ex. D to Dühring

Aff., Doc. No. 129-2.

The Raytheon Drawing was labeled a "vendor item control drawing."  Defs.' SOF, Doc.

No. 132, ¶¶ 13, 18; Raytheon Drawing, Ex. D to Dühring Aff., Doc. No. 129-2.  A vendor item

control drawing "provides an engineering description and acceptance criteria for commercial

items or vendor-developed items that are procurable from a specialized segment of industry," in

addition to "the vendor's item identification, and sufficient engineering definition for acceptance

of interchangeable items within specified limits."  Defs.' SOF, Doc. No. 132, ¶ 15; American

Society of Mechanical Engineers ("ASME") Y14.24-2012, Ex. 7 to Affidavit of Sara Sharp

("Sharp Aff."), Doc. No. 126-7, § 10.2.1.  A "vendor-developed item[ ]" is a "specialized version of a vendor's general product line" that generally not stocked off-the-shelf but may be procurable on order.  *Id.* at § 3.49.

A vendor item control drawing includes a "list of suggested source(s) of supply," which is "not intended to represent the only sources for the item."  *Id.* § 10.2.1.  The Raytheon Drawing identified RBC, and only RBC, as a "suggested source[ ] of supply."  Def.'s SOF, Doc. No. 132, ¶ 20; Raytheon Drawing, Ex. B to Dühring Aff., Doc. No. 127-2.  The drawing identified the "DESIGN ACTIVITY CAGE CODE" for the Rod End as "15090," the Commercial and Government Entity ("CAGE") code associated with Raytheon.  Defs.' SOF, Doc. No. 132, ¶ 22.  In the suggested sources section, the drawing additionally identified CAGE code "73134," the RBC-Heim CAGE code.  Pl.'s SOF, Doc. No. 147, ¶ 22; Raytheon Drawing, Ex. B to Dühring Aff., Doc. No. 127-2.

The Raytheon Drawing indicated certain specifications for the Rod Ends.  The parties agree that the drawing specified a heat treatment range for the housing material, ██████████ ████████████████████████████; ████████ of the housing material; the use of██ ████████; and a ██████████████████████.  Pl.'s SOF, Doc. No. 147, ¶¶ 25-30.  They disagree about the specificity of the specifications concerning the housing material and whether the drawing indicates that the ████████████████████████.  *Id.* ¶¶ 24, 33.

The Raytheon Drawing was marked "Raytheon Proprietary" and "Copyright 2015 Raytheon Company."  Raytheon Drawing, Ex. B to Dühring Aff., Doc. No. 127-2.  The Raytheon Drawing did not include any RBC logo.  *Id.*

5. *The Relationship Between Multicut and RBC, and the Multicut-RBA Mutual Confidentiality Agreement ("MCA")*

As Multicut developed its wing assembly proposal for Raytheon, on August 18, 2016 MNA's Chief Executive Officer Frank Dühring contacted RBC for the first time to request its price for the Rod Ends.  Defs.' SOF, Doc. No. 132, ¶¶ 38-39.  In the email, Dühring

████████████████████████████████████████████████████████

████████████████████████████████████████  Pls.' SOF, Doc. No. 147, ¶ 38; Ex. 15 to Leddy Decl., Doc. No. 148-10, at 2.

A few weeks later, before the parties had executed a nondisclosure agreement, RBC issued a quote to Multicut on August 30, 2016.  Pl.'s SOF, Doc. No. 147, ¶ 81 (citing Ex. 16 to Leddy Decl., 148-11, at 2).  The parties agree that RBC's price was high, which RBC contends reflects a "premium" over the price of a catalog or off-the-shelf rod end due to the rod end bearings' "independent economic value" based on RBC's putative trade secret.  *Id.* (citing Declaration of Ken Giuntiloi ("Giuntoli Decl."), Doc. No. 149, ¶ 14).  RBC notes that Dühring did not complain about the price to RBC at the time.

In January of 2017, Dühring sought to procure a small quantity of rod ends from RBC. Giuntoli Decl., Doc. No. 149, ¶ 15.  In furtherance of that transaction, MNA and RBC entered into a Mutual Confidentiality Agreement ("MCA") on February 13, 2017.  Defs.' SOF, Doc. No. 132, ¶ 40; Ex. C. to Dühring Aff., Doc. No. 127-3.

The MCA provided in relevant part as follows:

WHEREAS, the parties are considering a potential business transaction (the "Proposed Transaction"); and

WHEREAS, as a condition to each party furnishing the other party with information in connection with its evaluation of the Proposed Transaction, each party is requiring the other party to treat confidentially any Confidential Information (as defined below) that it or its directors, officers, employees, agents

9

or advisors (collectively, a "Disclosing Party") furnishes to the other party or its directors, officers, employees, agents or advisors (collectively, the "Receiving Party"); and

WHEREAS, each party desires to ensure that the Confidential Information (as defined below) so disclosed will not be used for any purpose other than an evaluation of the Proposed Transaction and, if appropriate, the negotiation of mutually acceptable definitive agreements.

NOW THEREFORE, in consideration of the foregoing and the mutual agreements and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1. Confidential Information. For purposes of this Agreement, the term "Confidential Information" shall mean, with respect to the Disclosing Party, any "Trade Secret" (as defined under applicable law) or any information which:

(a) Is not generally available to the public; and

(b) Pertains or relates in any way to the Disclosing Party or its businesses, activities, products or services including, without limitation, . . . price lists. . . , intellectual property rights, systems, programs, techniques, know-how. . . ,works of authorship, contracts and licenses, pricing methods or other similar information, as well as any copies, reproductions, summaries, extracts, analyses, studies or other derivative works prepared by the Receiving Party or

(c) Its representatives incorporating or developed from the Confidential Information so disclosed.

Notwithstanding the foregoing, if any Confidential Information pertaining to a Disclosing Party shall become generally available to the public other than as a result of a breach by the Receiving Party of its covenants hereunder, the same shall no longer be considered Confidential Information for purposes of this Agreement. In addition, the term Confidential Information  shall not include information, technical data or know-how which (i) is in the public domain at the time of receipt, (ii) is in the possession of the Receiving Party at the time of disclosure, (iii) is expressly approved by the Disclosing Party, in writing, for release, (iv) comes into the possession of the Receiving Party from a third party that was not, to the Receiving Party's knowledge, subject to any confidentiality restriction, or (v) is independently developed by the Receiving Party without reference to the Confidential Information.

Written materials that are intended to fall under the protection of this Agreement will be clearly marked "Confidential," "Proprietary" or similar marking. When verbal discussions between the Parties include Confidential Information, or if information is to be conveyed visually, that fact shall be announced in the

discussion, and then within ten days the oral or visual summarized in writing by the Disclosing Party, marked appropriately as above, and presented to the Receiving Party. During that delay, Confidential Information disclosed verbally or visually will be treated exactly as if it had been disclosed in writing.

Each Disclosing Party owns all rights with respect to its Confidential Information disclosed to the Receiving Party, and no right, express or implied, is conveyed to the receiving Party by the disclosure of the Confidential Information that is made by the Disclosing Party to the Receiving Party.

2. Prohibition Against Disclosure or Use. The parties shall use the Confidential Information only for the purpose of evaluating the Proposed Transaction and, if appropriate, the negotiation of mutually acceptable definitive agreement and the performance of work under those agreements. Except as otherwise provided herein, neither party shall disclose to any third party any Confidential Information concerning a Disclosing Party or appropriate any such Confidential Information for its use or benefit or for the use or benefit of any third party. Each Receiving Party agrees that it shall not disclose to any person or entity, other than the Receiving Party's agents, representatives or corporate officers that have a need to know, any such Confidential Information without the prior written consent of the Disclosing Party.

MCA, Doc. No. 127-3.

6. *The Multicut RFQ and Mutlicut RFQ Drawings*

In or around May and June 2017, Multicut contacted certain third parties seeking quotes for the supply of the Rod Ends (the "Multicut RFQ"). Defs.' SOF, Doc. No. 132, ¶ 45. The Multicut RFQ included a copy of the Raytheon Drawing that retained all Raytheon proprietary and export control markings but did not include the table identifying "suggested source(s) of supply" ("Multicut RFQ Drawings"). *Id.* ¶ 46.

On or about May 9, 2017, an entity affiliated with RBC received a copy of the Multicut RFQ, which included the Multicut RFQ Drawings, from a third-party. *Id.* ¶ 48; Giuntoli Decl., Doc. No. 149, ¶¶ 22-24. On or about May 15, 2017, RBC's Ken Giuntoli received a copy of the Multicut RFQ from the affiliate, with the Multicut RFQ Drawings appended thereto. *Id.* ¶ 49.

RBC submitted a bid; in response, Dühring advised RBC that Multicut had obtained competitive bids from other potential suppliers and that RBC's price was "way off" from the others.  Defs.' SOF, Doc. No. 132, ¶¶ 50-51.

7.  *The Correspondence Concerning Alleged Trade Secrets*

On July 2, 2017, Giuntoli e-mailed Dühring as follows:



*Id.* ¶ 53; Ex. E to Dühring Aff., Doc. No. 129-3 [hereinafter, "Giuntoli Email"].

On July 4, 2017, Dühring emailed the following response to Giuntoli:



*Id.* ¶ 56; Ex. E to Dühring Aff., Doc. No. 129-3.

Multicut contends that RBC did not reply to Dühring's email. *Id.* ¶ 57. RBC counters that it sent Multicut a letter on July 17, 2017 ███████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.

Pl.'s SOF, Doc. No. 147, at 57; Ex. 44 to Leddy Aff., Doc. No. 148-36.

### 8. *Multicut Selects An Alternate Supplier*

Multicut and RBC ultimately failed to agree on a price and exclusivity agreement for the Rod Ends for the SDB II program. Giultoli Decl., Doc. No. 149, ¶ 31.

On January 9, 2018, Multicut informed RBC that it had selected an alternative supplier ████████. Defs.' SOF, Doc. No. 132, ¶ 63; Dühring Tr., Ex. 9 to Leddy Decl., Doc. No. 148-5, 189:8-20. RBC contends that it was deceptively "strung along" while Multicut finalized its agreement with the alternative supplier. Pl.'s Opp'n, Doc. No. 146, at 10.

Raytheon entered into a long-term supply agreement with Multicut for the wing assemblies. ████████ remains Multicut's supplier for rod end bearings.

### B. Procedural History

On July 2, 2018, RBC filed an application for prejudgment remedy and proposed nine-count complaint in the Superior Court for the State of Connecticut, Judicial District of Ansonia/Milford at Milford. Compl., *Roller Bearing Company of America, Inc. v. Multicut North America, Inc.* (Conn. Sup. Ct. July 2, 2018). RBC asserted claims for breach of contract, tortious interference with prospective contractual relations, conversion, misrepresentation, misappropriation of confidential information and violation of the Connecticut Unfair Trade

13

Secrets Act, violation of the Connecticut Unfair Trade Practices Act, breach of the covenant of good faith and fair dealing, unjust enrichment, and promissory estoppel. *See generally* Doc. No. 1-1.  RBC sought damages, costs, reasonable royalties, [], interest, punitive damages, attorneys' fees, a temporary restraining order, and a permanent injunction. *Id.* at 46-47.

On July 23, 2018, MNA removed this action to this Court pursuant to 28 U.S.C. § 1441(b). *Notice of Removal*, *Roller Bearing Company of America, Inc. v. Multicut North America, Inc.,* Doc. No. 1.  RBC did not oppose removal.

On September 21, 2018, RBC filed an amended complaint. Am. Compl., Doc. No. 15. The Amended Complaint asserted claims for breach of contract; violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836; violation of the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. §§ 35-50 *et seq.*; tortious interference with prospective contractual relations; fraudulent inducement; violation of Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 *et seq.*; breach of covenant of good faith and fair dealing; unjust enrichment; and promissory estoppel. *See generally id.*

On November 13, 2018, MNA moved to dismiss this action for lack of jurisdiction. Doc. No. 25.

On April 4, 2019, on the record at a hearing, I denied without prejudice MNA's motion to dismiss for lack of jurisdiction. Doc. No. 48.

On April 5, 2019, RBC moved for a prejudgment remedy.  Mot. for PJR, Doc. No. 49.

On April 8, 2019, I denied RBC's motion for a prejudgment remedy.  Doc. No. 52.

On May 8, 2020, RBC brought a second suit against Multicut A/S in this district. Compl., *Roller Bearing Company of America, Inc. v. Multicut Denmark A/S*, Dkt. No. 3:20-cv-645 (SRU) (D. Conn. May 8, 2020).  Simultaneously, RBC moved to consolidate the Multicut

A/S action with the instant matter and amend its complaint.  Mot. to Amend, Doc. No. 63.  On

October 14, 2020, I granted RBC's motion and consolidated the actions into the instant case, to

proceed against both Multicut entities.  Oct. 14, 2022 Order, Doc. No. 68-69.

Also on May 8, 2020, RBC brought suit against Raytheon in the District of

Massachusetts.  Compl., *Roller Bearing Company of America, Inc. v. Raytheon Company*, Dkt.

No. 1:20-cv-10889 (IT) (D. Mass. May 8, 2020) (the "Massachusetts Action").

In the Massachusetts Action, RBC alleged that Raytheon misappropriated RBC's trade

secrets by forwarding the Raytheon Drawing to Multicut; failing to prevent Multicut from further

disclosing the Raytheon Drawing; and asserting ownership over the design and specifications

disclosed in the Raytheon Drawing.  *See generally* Am. Compl., Dkt. No. 1:20-cv-10889 (IT),

Doc. No. 21.  RBC moved to transfer the Massachusetts Action to the District of Connecticut,

but the District of Massachusetts denied the motion.  Massachusetts Action, Doc. No. 45.

On December 21, 2020, RBC filed the operative complaint.  SAC, Doc. No. 75.

On October 28, 2020, MNA filed an amended answer.  MNA Ans., Doc. No. 70.

On December 21, 2020, Multicult A/S filed an answer.  Multicut Ans., Doc. No. 74.

On December 2, 2022, Defendants moved for summary judgment.  Defs.' Mot., Doc. No.

124.  Defendants made the following arguments.

First, Multicut did not breach its Mutual Confidentiality Agreement ("MCA") with RBC

because the information allegedly disclosed was provided to Multicut by Raytheon, not RBC,

and was not "Confidential Information" within the scope of the MCA.  Because it is undisputed

that RBC never furnished any drawings to Multicut, Multicut argues, it could not have breached

the MCA.  *Id.* at 1.

Second, Multicut did not misappropriate any RBC trade secret or proprietary information as a result of its acquisition, use, or disclosure of the Raytheon Drawings because (1) Multicut lacked actual or constructive notice of the existence of any RBC trade secret contained in the Raytheon Drawing, (2) RBC failed to describe its alleged trade secret with sufficient particularity, (3) RBC cannot establish the existence of a valid trade secret in connection with the information in the Raytheon Drawing, and (4) RBC failed to take reasonable steps to protect the secrecy of any such information.  *Id.* at 1-2.

Third, RBC's claim for breach of the covenant of good faith and fair dealing fails because Multicut's conduct did not impair RBC's contractual rights.  *Id.* at 2.

Fourth, RBC's claims for tortious interference, CUTPA, unjust enrichment, and promissory estoppel because the claims are preempted by the Connecticut Unfair Trade Secrets Act and are not independently actionable.  *Id.* at 2.

Fifth, RBC's declaratory judgment claim because it is not independently actionable.  *Id.* at 2-3.

In support of its motion, Defendants filed a Local Rule 56(a)(1) Statement of Material Facts, *see* Defs.' SOF, Doc. No. 125 (redacted) and 132 (unredacted), and thirty exhibits.

On January 18, 2023, RBC opposed Defendants' motion for summary judgment.  Pl.'s Opp'n, Doc. No. 146.  RBC made the following arguments in opposition.

First, Multicut breached the Mutual Confidentiality Agreement, and the court should reject Multicut's construction of the Mutual Confidentiality Agreement.

Second, there are genuine issues of material fact concerning whether Multicut misappropriated RBC's trade secret design.

Third, CUTSA does not preempt RBC's state law claims.

In support of its memorandum in opposition, RBC filed a Local Rule 56(a)2 Counter-Statement of Material Facts supported by seventy-eight exhibits.  Pl.'s SOF, Doc. No. 141-1 (redacted) and 147 (unredacted).

On March 3, 2023, Defendants replied.  Defs.' Reply, Doc. No. 157.

The Court held oral argument on July 12, 2023.  Min. Entry, Doc. No. 159.

## II.    Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor.  *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).  When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings, but it must present sufficient probative evidence to establish a genuine issue of material fact.  *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).  If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted.  *Anderson*, 477 U.S. at 249–50 (citations omitted).

The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48.  To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party."  *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate.  *Celotex*, 477 U.S. at 322-23.  In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.*; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18-19 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim).  In short, if there is no genuine issue of material fact, summary judgment may enter.  *Celotex*, 477 U.S. at 323.

## III.    Discussion

### A.    Counts One and Seven: RBC's Contract Claims

#### 1.    *Count One: Breach of Contract*

In Count One, RBC alleged that Multicut breached the MNA-RBC Mutual Confidentiality Agreement ("MCA") when Multicut disclosed RBC's trade secrets, drawings, designs, prints, pricing, and parts numbers to unauthorized third parties.  SAC, Doc. No. 75, ¶¶ 91-101.  Multicut seeks summary judgment on Count One under a theory that the Raytheon

Drawing reproduced in the Multicut RFQ is beyond the scope of the MCA.  Defs.' Mem., Doc. No. 131, at 15-16.  Multicut further contends that the Raytheon Drawing is expressly excluded from coverage by the MCA in light of the fact that it was disclosed by Raytheon to Multicut prior to execution of the MCA.  *Id.* at 17-18.  RBC disagrees with Multicut's construction of the parties' agreement.  Pl.'s Opp'n, Doc. No. 146, at 18-20.  In the alternative, RBC contends that ambiguities in the contract preclude summary judgment.  *Id*. at 20.  Although I do not entirely agree with RBC's reasoning, I agree that Multicut is not entitled to summary judgment on Count One.

        a.   Relevant facts

The MCA defines "'Confidential Information,'" "with respect to the Disclosing Party," as "any 'Trade Secret,'" as defined by applicable law, "or any information [that] is not generally available to the public; and [p]ertains or relates in any way to the Disclosing Party or its business, activities, products or services . . . as well as any copies, reproductions, . . . or other derivative works prepared by the Receiving Party, or its representatives incorporating or developed from the Confidential Information so disclosed."  MCA, Doc. No. 127-3, § 1.

In its preamble, the MCA contains a recital (hereinafter, the "Second Whereas Clause") stating that "as a condition to each party furnishing the other party with information in connection with its evaluation of the Proposed Transaction, each party is requiring the other party to treat confidentially any Confidential Information (as defined below) that it or its directors, officers, employees, agents or advisors (collectively, a 'Disclosing Party') furnishes to the other party or its directors, officers, employees, agents or advisors (collectively, a 'Receiving Party')."  *Id.* at 1.

Through the MCA, the parties agreed to "use the Confidential Information" within specified limits and not "disclose to any third party any Confidential Information concerning a Disclosing Party or appropriate any such Confidential Information for its use or benefit or for the use or benefit of any third party." *Id*. § 2.

The MCA further provides that "the term Confidential Information shall not include information, technical data or know-how" that "(ii) is in the possession of the Receiving Party at the time of disclosure" and "(iv) comes into the possession of the Receiving Party from a third party that was not, to the Receiving Party's knowledge, subject to any confidentiality restriction." *Id.* § 1(c) (emphasis added).

It is undisputed that Raytheon disclosed the Raytheon Drawing to Multicut in 2016, before the MCA was executed on February 13, 2017.  Def.'s SOF, Doc. No. 132, ¶¶ 10, 38-39, 41 (stating that Raytheon disclosed the drawing to Multicut in May of 2016); Pl.'s SOF, Doc. No. 147, ¶ 10 (citing to Dühring Aff., Doc. No. 127, ¶ 8, wherein Dühring testified that Raytheon disclosed the drawing in July of 2016).

      b.   Whether the parties intended that MCA exclusively cover information disclosed by a Disclosing Party to a Receiving Party is, at best, a genuine issue of material fact.

Under Connecticut law, "[t]he elements of a breach of contract claim are the [1] formation of an agreement, [2] performance by one party, [3] breach of the agreement by the other party, and [4] damages." *Meyers v. Livingston, Adler, Pulda, Meiklejohn and Kelly, P.C.*, 311 Conn. 282, 291 (2014).  If the language of a contract is clear and unambiguous, the question of the parties' intent is an issue of law.  *See Cruz v. Visual Perceptions, LLC*, 311 Conn. 93, 101 (2014).  By contrast, if the language of the contract is ambiguous, meaning the language of the

contract is susceptible to more than one reasonable interpretation and the parties' intent is not

clear from the language, then the issue of intent presents a question of fact. *See id.*

The parties' dispute principally concerns the Second Whereas Clause, which they agree is

a recital.  Multicut contends that the Second Whereas Clause is a recital incorporated by

reference, therefore a binding contract provision, which unambiguously provides that the MCA

only covers information disclosed by RBC to Multicut (or vice versa).  Defs.' Reply, Doc. No.

157, at 2-3.  RBC counters that the Second Whereas Clause is a non-binding recital.  Pl.'s Opp'n,

Doc. No. 146, at 19.

Although a contract recital like the Second Whereas Clause is generally a nonbinding

"explanation[] of the circumstances surrounding the execution of a contract," a recital may

nevertheless become a "binding obligation[]" if it is "referred to in the operative provisions of

the contract."  *Tomey Realty Co. v. Bozzuto's, Inc.*, 168 Conn. App. 637, 653 n.10 (2016)

(quoting *DeMorais v. Wisniowski*, 81 Conn. App. 595, 610 (2004)).  To illustrate that

proposition, Multicut relies on an instructive analogue: *McGinnis v. Vischering, L.L.C.*, 808

N.W.2d 756, 2011 WL 5867051, *5-6 (Iowa Ct. App. 2011) (unpublished table decision).

There, the plaintiff tenants asserted breach of contract claim arising from the defendant

landlord's failure to deliver office space equal to the square footage specified in the plaintiffs'

respective commercial leases.  *Id.* at *1.  After a trial in which the jury agreed with the plaintiffs

that the landlord had breached the lease agreements, the landlord moved for a judgment

notwithstanding the verdict.  *Id.* at *2.  The landlord argued that the plaintiffs could not sustain a

breach of contract claim arising from its alleged failure to provide office space equal to the

number of "rentable square feet" specified in the lease, because the amount of space leased was

altered by a load factor.  *Id.* at *1.  The landlord argued that the "rentable square feet" language

on which the plaintiffs relied was included only in an introductory recital and thus was not a binding provision of the lease. *Id*. at *5. The trial court denied the motion, and the landlord appealed. *Id.* at *2.

The Iowa Appellate Court affirmed, applying a rule identical to Connecticut law that recital language becomes binding when a term defined in the recital is "referred to in the operative provisions" of the contract. *Id*. at *5. There, the contract contained a "witnesseth clause," which defined the term "demised premises" as "office space containing approximately ____ rentable square feet." *Id.* Because the term "demised premises" was "referenced and incorporated into" in the operative portions of the lease, the witnesseth clause's "rentable square feet" specification had defined an "essential term" of the parties' contract. *Id*.

Here, for reasons analogous to those explained by the *McGinnis* court, I agree with Multicut that the MCA— by repeatedly referencing "Disclosing Party" and "Receiving Party" throughout the operative provisions of the agreement— incorporates by reference the definitions of the terms "Disclosing Party" and "Receiving Party," which the MCA respectively defines in the Second Whereas Clause as "each party . . . or its directors, officers, employees, agents or advisors" that "furnishes [Confidential Information] to the other party or its directors, officers, employees, agents or advisors. . . ." MCA, Doc. No. 127-3, at 1.

That said, I do not agree with the next step in Multicut's chain of reasoning. As Multicut reads the MCA, "only 'Confidential Information . . . that [a party's] directors, officers, employees, agents or advisors . . . furnishes to the other party' falls within the scope of the [agreement]." Defs.' Mem., Doc. No. 131, at 15. Multicut further reads language in the Second Whereas Clause stating that "as a condition to each party furnishing the other party with information. . . [,] each party is requiring the other party to treat confidentially any Confidential

Information (as defined below)" to require that RBC establish as a condition precedent to its breach of contract claim that the information was furnished by RBC to Multicut. *Id.* at 15-16. Because the Raytheon Drawing was not disclosed by a "Disclosing Party" (RBC) but was instead disclosed by a third party (Raytheon), Multicut reasons, the Raytheon Drawing was outside of the scope of the parties' agreement. *Id.* at 16. I perceive several problems with the analysis.

One, Multicut's construction of the Second Whereas Clause conflicts with the MCA's express terms. The Second Whereas Clause explicitly provides that the term "Confidential Information" is "as defined below"— by implication, in the section distinguished as operative by the proceeding signal phrase "NOW THEREFORE." MCA, Doc. No. 127-3, at 1. *See Hawley Enterprises, Inc. v. MTM Classic Homebuilders, Ltd.*, 2014 WL 3715071, at *4 (Conn. Super. Ct. June 18, 2014) (explaining that the contractual obligations at issue began not with the whereas clauses but with the numbered paragraphs following "NOW, THEREFORE, the parties agree as follows. . . ."). The Second Whereas Clause thus appears to direct the parties *not* to incorporate by reference the exact language on which Multicut bases its argument that disclosure between the parties is a condition precedent to a breach of the agreement. Said differently, the Second Whereas Clause can and does incorporate by reference the meanings of "Disclosing Party" and "Receiving Party" without altering the definition of "Confidential Information" set forth in the operative portion of the contract.

Two, as RBC observes, none of the controlling provisions of the MCA expressly limit "Confidential Information" to information furnished by a Disclosing Party to a Receiving Party.

Three, by contrast, the operative provisions of the MCA contemplate the possibility that a third party may provide information subject to the contract's broad definition of "Confidential Information" to a Receiving Party. Specifically, subsection 1(c)(iv) provides that "[t]he term

Confidential Information shall not include information . . . which . . . comes into the possession of the Receiving Party *from a third party* that was not, to the Receiving Party's knowledge, subject to any confidentiality restriction. . . ."  MCA, Doc. No. 127-3, § (1)(c)(iv) (emphasis added).  Subsection 1(c)(iv) suggests that information that comes into the possession of the Receiving Party from a third party that the Receiving Party knew was subject to a confidentiality restriction could indeed qualify as Confidential Information within the meaning of the MCA.  In this case, there is no dispute that the Raytheon Drawing was marked "COPYRIGHT 2015 RAYTHEON COMPANY," and thus no genuine dispute that Multicut knew that the drawing was subject to a confidentiality restriction.  Defs.' SOF, Doc. No. 132, ¶ 17.

As a result, even if I assume that Multicut reasonably construes the MCA, the language of the agreement is susceptible to more than one reasonable interpretation.  Multicut's interpretation that Second Whereas Clause manifests the parties' intent to require that the MCA only govern information disclosed between the parties, taken together with the language in the agreement suggesting that it may in certain circumstances reach information disclosed by a third party, reveals that the agreement is at best ambiguous.[2]  When a contract is ambiguous, a claim for breach of contract is not amenable to summary resolution.  *Prestige Cap. Corp. v. Colt's Mfg. Co., LLC*, 2018 WL 4288642, at *3 (D. Conn. Sept. 7, 2018).

Accordingly, Multicut is not entitled to judgment as a matter of law on Count One on the basis that the Raytheon Drawing is outside the scope of the MCA.

---

[2] Multicut additionally argues that the Second Whereas Clause plainly and unambiguously reflects the parties' intent to protect only confidential information exchanged by the parties, and that RBC's interpretation renders this provision surplusage in contravention of basic principles of contract interpretation.  Defs.' Reply, Doc. No. 157, at 5-6.  For the reasons set forth in this section, I disagree.

c.  Multicut's contention that the Raytheon Drawing was outside the scope of the MCA because it was not marked with the necessary confidential or proprietary marking is unavailing.

Multicut next argues that RBC must establish as a condition precedent to its breach of contract claim that the information furnished by RBC to Multicut was clearly marked as "confidential," "proprietary," or otherwise by RBC.  Defs.' Mem., Doc. No. 131, at 17; *see also* Defs.' Reply, Doc. No. 157, at 6-8.  Because RBC undisputedly did not mark the Raytheon Drawing as confidential, Multicut reasons, the drawing falls outside the scope of "Confidential Information" within the meaning of MCA.  RBC disagrees, contending that the Raytheon confidential and proprietary markings pass muster under the terms of the MCA.  Pl.'s Opp'n, Doc. No. 146, at 21-22.  I agree with RBC that the Raytheon Drawing was adequately labeled and that Multicut cannot defeat RBC's breach claim on the basis of non-compliant identification of confidential information.

The MCA requires that "[w]ritten materials that are intended to fall under [its] protection . . . will be clearly marked 'Confidential,' 'Proprietary' or similar marking."  MCA, Doc. No. 127-3, § 1(c).  Under those express terms, the parties agree that written materials must be "clearly marked" as confidential, proprietary, etc. to be "Confidential Information" within the meaning of the MCA.  *Compare* Pl.'s Opp'n, Doc. No. 146, at 16, *with* Defs.' Reply, Doc. No. 157, at 6-7.  They merely dispute who must mark the materials accordingly.

By its plain terms, the MCA does not specify who must do the actual marking nor that the Disclosing Party necessarily identify the information as confidential and/or proprietary to that party.  In other words, I agree with RBC that Multicut seeks to enforce language that does not appear on the face of the contract.  The MCA requires only that "[w]ritten materials that are intended to fall under the protection of [the MCA] *will be clearly marked*."  MCA, Doc. No.

127-3, § 1(c).  There is no dispute that the Raytheon Drawing was marked "RAYTHEON

PROPRIETARY" and "COPYRIGHT 2015 RAYTHEON COMPANY."  Defs.' SOF, Doc. No.

132, ¶ 17.  Therefore, there is no genuine issue of material fact that Raytheon Drawing satisfied

the requirement that information be "clearly marked" as confidential or proprietary.

Multicut's argument in reply does not undermine my interpretation of the MCA.

Multicut points to the following language: "When verbal discussions between the Parties include

Confidential Information . . . that fact shall be announced in the discussion, and then within ten

days the oral or visual summarized in writing by the Disclosing Party, marked appropriately as

above, and presented to the Receiving Party."  MCA, Doc. No. 127-3, § 1(c).  But the language

on which Multicut relies only applies in a specific situation, not proven to have occurred here, in

which the parties' discussion triggers a follow-up obligation on behalf of the Disclosing Party.

Multicut also cites to *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F.

Supp. 3d 224 (S.D.N.Y. 2014), *aff'd sub nom. Big Vision Priv. Ltd. v. E.I. du Pont de Nemours*

*& Co.*, 610 F. App'x 69 (2d Cir. 2015), but the decision is inapposite.  There, plaintiff Big

Vision claimed that defendant DuPont had breached two nondisclosure agreements the parties

had executed.  *Id.* at 230, 252.  Big Vision claimed that it had disclosed information to DuPont

during and in connection with laboratory trials that was and was designated under the parties'

nondisclosure agreements as confidential, and that DuPont subsequently used the information in

violation of the agreements.  *Id.* at 252-53.  Big Vision, however, had not actually designated the

information as confidential pursuant to the express terms of the NDAs.  *Id.* at 253-54.  Under the

express terms of the parties' agreements, information was confidential where it was disclosed (i)

"in writing, or in other tangible form, and designated confidential in writing at the time of

disclosure," or (ii) "orally or visually, summarized and confirmed confidential in writing within

thirty (30) days." *Id.* at 252.  But Big Vision had not contemporaneously designated the information as confidential in writing as required by the agreement; therefore, the information disclosed was not governed by the parties' agreement. *Id.* at 253-54.  As a result, the court concluded, DuPont did not breach its agreement with Big Vision, and summary judgment in DuPont's favor was warranted. *Id.* at 252.

Here, as set forth, it is undisputed that the Raytheon Drawing was marked "confidential" and "Raytheon Proprietary."  The designations satisfy the plain terms of the MCA.  The fact that Raytheon (and not RBC) put the markings on the drawing is not material to any genuine issue.

Accordingly, Multicut is not entitled to judgment as a matter of law on Count One on the basis that the Raytheon Drawing was insufficiently marked.

> d.   Whether the MCA excludes the already-disclosed Raytheon Drawing from the meaning of "Confidential Information" is a genuine issue of material fact.

Multicut contends in the alternative that RBC cannot prove a breach of the MCA for Multicut's disclosure of the Raytheon Drawing because the drawing was subject to subsection 1(c)(ii)'s exclusion for information that "is in the possession of the Receiving Party at the time of disclosure."  Defs.' Mem., Doc. No. 131, at 17 (quoting MCA, Doc. No. 127-3, § 1(c)(ii)).   The exclusion, however, does not apply to the Raytheon Drawing.

Here, it is undisputed that Multicut received the Raytheon Drawing from Raytheon no later than July 2016 and first communicated with RBC no earlier than August 2016; it follows that Multicut already possessed the Raytheon Drawing at the earliest possible opportunity for RBC to have disclosed it to Multicut.  *See* Def.'s SOF, Doc. No. 132, ¶¶ 10; Pl.'s SOF, Doc. No. 147, ¶ 10.  As a result, Multicut argues, the Raytheon Drawing was information that was already in the possession of the Receiving Party (Multicut), was not "Confidential Information" within

the meaning of the MCA, and Multicut did not have a contractual duty to maintain the confidentiality of the drawing.  Defs.' Mem., Doc. No. 131, at 17.  RBC counters that the Raytheon Drawing was not subject to the subsection 1(c)(ii) exclusion because that provision "refers to the first 'disclosure' to Multicut. . . , which logically includes the 'disclosure' of the design by Raytheon to Multicut in 2016."  *See* Pl.'s Mem., Doc. No. 146, at 23.  I agree with RBC.

One, Multicut's argument is predicated on its interpretation that the MCA only covers information disclosed by a Disclosing Party to a Receiving Party.  But, as explained above, whether the parties intended that the MCA only cover information disclosed between the parties is a genuine issue of material fact.

Two, the MCA does not provide that it excludes from the meaning of "Confidential Information" only that information which is in the possession of the Receiving Party at the time of disclosure *by the Disclosing Party.*  The provision does not specify that the Disclosing Party must make the disclosure.  As a result, I agree with RBC that Multicut reads a requirement into the MCA that does not exist, in contravention of basic principles of contract interpretation.  *See Dotolo v. Petrucelli*, 152 Conn. 654, 656 (Conn. 1965) ("Terms cannot be added to a contract by interpretation.").  The MCA plainly refers to "possession . . . at the time of disclosure."  Here, the undisputed facts establish that the Raytheon Drawing was disclosed by Raytheon to Multicut in 2016, and that Multicut did not previously possess RBC's purported trade secret before Raytheon disclosed the drawing.

I have considered Multicut's other arguments and find them to be without merit.

Because Multicut has not set forth a valid basis for summary judgment on RBC's breach of contract claim, I deny Multicut's motion for summary judgment on Count One.

2. *Count Seven: Breach of the Implied Covenant of Good Faith and Fair Dealing*

In Count Seven, RBC asserts that MNA breached the implied covenant of good faith and fair dealing by acting in bad faith by "misappropriating RBC's trade secrets and confidential information under an appearance of cooperation, when [it] never intended to honor its confidentiality obligations"; by "intend[ing] to mislead and deceive RBC and later, to misappropriate RBC's trade secrets and disclose such trade secrets to other bearing suppliers in order to obtain a cheaper price"; and by "never intend[ing] to comply with its obligations under the RBC-MNA Confidentiality Agreement."  SAC, Doc. No. 75, ¶¶ 172-79.  Multicut moves for summary judgment on Count Seven, arguing that the claim fails for the same reasons that RBC's breach of contract claim.  Defs.' Mot., Doc. No. 124, at 2.

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."  *Warner v. Konover*, 210 Conn. 150, 154 (1989) (citation omitted).  In order to prove a breach of the implied covenant of good faith and fair dealing, a plaintiff must show that the defendant acted in bad faith to "impede[ ] the plaintiff's right to receive benefits that [the plaintiff] reasonably expected to receive under the contract."  *De La Concha of Hartford v. Aetna Life Ins. Co.*, 269 Conn. 424, 433 (2004).  But "[t]he covenant of good faith and fair dealing is not implicated by conduct that does not impair contractual rights."  *Fin. Freedom Acquisition, LLC v. Griffin*, 176 Conn. App. 314, 340 (2017) (citation omitted).  In other words, an implied covenant claim is not viable without a breach of the underlying contract.  *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 798 (2013).

For the reasons set forth in the previous subsection, Multicut has not carried its burden to prove that no reasonable jury could find that RBC can prevail on its breach of contract claim based on Multicut's alleged breach of the MCA.  Therefore, it is premature to conclude that no

reasonable jury could find that RBC can prevail on its claim for breach of the implied covenant of good faith and fair dealing.

Because Multicut has not set forth a valid basis for summary judgment on RBC's breach of the implied covenant claim, I deny Multicut's motion for summary judgment on Count Seven.

### B. Counts Two and Three: Trade Secret Claims

In Counts Two and Three, RBC asserts that Multicut misappropriated its trade secrets in violation of federal and state law.  Specifically, Count Two claims that Multicut violated the Defend Trade Secrets Act ("DTSA") of 2016, 18 U.S.C. § 1836.  SAC, Doc. No. 75 ¶¶ 102-20, 121-36.  To prevail on a DTSA claim, a plaintiff must prove "(1) the existence of a trade secret, defined broadly as information with independent economic value that the owner has taken reasonable measures to keep secret, and (2) misappropriation of that secret, defined as the knowing improper acquisition and use or disclosure of the secret." *Danping Li v. Gelormino*, 2019 WL 1957539, at *8 (D. Conn. May 2, 2019) (quoting *Par Pharm., Inc. v. QuVa Pharma, Inc.*, 2019 WL 1758468, at *3 (3d Cir. Apr. 3, 2019)).  Count Three claims that Multicut violated the Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. §§ 35-50 *et seq.*  To prevail on a CUTSA claim, a plaintiff must prove that the information that it claims is protected is of a type that can be considered a "trade secret" under Connecticut General Statutes § 35-51(d) and that the trade secret was misappropriated by the defendant.  *Dunsmore & Assocs., Ltd. v. D'Alessio*, 2000 WL 124995, at *4 (Conn. Super. Ct. Jan. 6, 2000) (citing Conn. Gen. Stat. §§ 35-51(b), (d)).  The existence of a trade secret and its misappropriation are questions of fact for which the plaintiff bears the burden of proof.  *Panterra Engineered Plastics, Inc. v. Transportation Sys. Sols., LLC*, 2008 WL 877003, at *3 (D. Conn. Mar. 27, 2008).

Multicut argues that it did not misappropriate any RBC trade secret or proprietary information as a result of its acquisition, use, or disclosure of the Raytheon Drawings because RBC did not describe its trade secret with sufficient particularity.  Multicut further argues that no reasonable jury could find that the Raytheon Drawing contained a trade secret, that RBC sufficiently protected its trade secret, or that Multicut misappropriated RBC's trade secret.  *See* Defs.' Mot., Doc. No. 124, at 15-18.  RBC disagrees, arguing that Multicut should have known that the Raytheon Drawing contained its trade secret design, such that Multicut's disclosure of the drawing to RBC's competitors constituted misappropriation.  *See generally* Pl.'s Opp'n, Doc. No. 146.  I agree with RBC that genuine issues of material fact preclude summary judgment to Multicut on the trade secret claims.

### 1.   *RBC has described its trade secret with sufficient particularity.*

Multicut first contends that it is entitled to summary judgment because RBC has failed to describe its trade secret with sufficient particularity.  I disagree.

A defendant must know what constitutes a plaintiff's trade secret to avoid misappropriating it and to defend itself against a plaintiff's claims of misappropriation.  *See Sit-Up Ltd. v. IAC/InterActiveCorp.*, 2008 WL 463884, at *11 (S.D.N.Y. Feb. 20, 2008).  As a result, courts consider whether a plaintiff has described its putative trade secret with sufficient particularity before reaching whether the plaintiff indeed has a protectable trade secret.[3]  *See*

---

[3] Multicut identifies the particularity requirement in decisions of the Second Circuit and district courts within the Second Circuit applying New York law.  Defs.' Mem., Doc. No. 131, at 29-30 (citing *Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 49 (2d Cir. 2018) (summary order); *Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 257-59 (S.D.N.Y. 2014), *aff'd sub nom. Big Vision Priv. Ltd. v. E.I. du Pont de Nemours & Co.*, 610 F. App'x 69 (2d Cir. 2015) (collecting cases)).  New York trade secret law expressly requires that a plaintiff identify a trade secret with particularity.  *Engleman v. David McKay Co.*, 422 N.Y.S.2d 95, 96 (App. Div. 1979).  Multicut, however, does not point to a Connecticut decision nor any federal decision applying Connecticut law articulating such a requirement.  Moreover, although the Second Circuit has suggested a minimum specificity requirement, it does not appear to have expressly articulated that a plaintiff must identify a trade secret with particularity.  *See Heyman v. AR. Winarick, Inc.*, 325 F.2d 584, 588 n.4, 590 (2d Cir. 1963) (rejecting trade secret

*Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 49 n.3 (2d Cir. 2018).  A trade secret is not defined with sufficient particularity where the description of the secret, or the mechanisms and relationships comprising the secret, is vague, indefinite, and/or ambiguous; where evidence containing the purported trade secret is vague, indefinite, and/or ambiguous; or where the plaintiff has inconsistently described its purported trade secret throughout the litigation.  *See Heyman v. AR. Winarick, Inc.*, 325 F.2d 584, 590 (2d Cir. 1963); *Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 49 (2d Cir. 2018).

Multicut contends that RBC has not identified its purported trade secret with sufficient particularity because the specifications in the Raytheon Drawing do not identify, either alone and in combination, any single rod end bearing design, and RBC's description of its trade secret is too vague to warrant protection.  Defs.' Mem., Doc. No. 131, at 29.  RBC counters that the Raytheon Drawing lists the unique combination of features constituting its trade secret design.  Pl.'s Mem., Doc. No. 146, at 39 (citing Exs. 11 and 25 to Leddy Decl., Doc. No. 148-7).  I agree with RBC that its description of its putative trade secret is sufficiently particularized for the summary judgment stage.

At the time that RBC initially notified Multicut of the potential disclosure of its alleged trade secret, Giuntoli advised Dühring that, although Giuntoli did not know what information Multicut had potentially provided to third parties, "the product design and the product drawing" were proprietary to RBC, and Multicut ███████████████████████████████████████

████████████████████████████████████████  Guintoli Email, Doc. No.

---

claim where the description of the trade secret as a "'quarternary' or a 'non-toxic surface agent'" was "so vague and indefinite as not to be entitled to protection under the law of trade secrets").  Nevertheless, the logic supporting a particularity requirement is especially sound at summary judgment in light of the plaintiff's burden to identify a genuine issue of fact for trial.  *See Next Commc'ns, Inc.*, 758 F. App'x at 49; *Big Vision Priv. Ltd.*, 1 F. Supp. 3d at 257.  Accordingly, I agree that RBC must identify its putative trade secret with sufficient particularity for its trade secret claims to survive summary judgment.

148-33, at 2-3.  Thereafter, in the July 17, 2017 letter RBC sent to Multicut, RBC explained that it had been "instrumental in providing a technical solution to the deployment mechanism that resulted in the creation of the 2296969 and 2294820 drawings," and further noting that RBC's product had been "specifically tested" to address the identified prior problems.  Ex. 44 to Leddy Aff., Doc. No. 148-36.  Moreover, in an August 9, 2017 email, RBC's John Clark reiterated that RBC had "invested heavily in engineering and design" of the Rod End and that it had "engineered the design of these products for this application for Raytheon."  Ex. 46 to Leddy Decl., Doc. No. 148-38, at 5-6.  At the time it warned Multicut of the potential disclosure, then, RBC had clearly identified that the Raytheon Drawing contained its alleged trade secret.

Regarding the pleadings, the original complaint and second amended complaint alleged that RBC had provided Raytheon with "a new and unique rod end bearing product with associated bushings," which "include[d] the use of stronger materials and new protective additives and coatings" that were "documented in RBC's proprietary notes and drawings" and shared with Raytheon pursuant to confidentiality agreements.  SAC, Doc. No. 75, ¶¶ 22-24, 27.  The original complaint also included as an exhibit a declaration from McNeil thoroughly describing RBC's claimed innovations, including the hardening of the ball material, the application of dry film lubricant, alterations to the dimensions of the rod end body, the head treatment, and the removal of the Malcomize treatment; and the original drawings with McNeil's hand-markings.  McNeil Aff. (June 26, 2018), Ex. 67 to Leddy Decl., Doc. No. 148-60, ¶ 15; Ex. 69 to Leddy Decl., Doc. No. 148-61 at 2, 4-6.

In discovery, RBC responded to Multicut's April 6, 2020 interrogatory requesting that it "[i]dentify and describe the specific information contained within the drawings produced as

Bates No. RBC00017 and RBC00018 that [RBC] contends is RBC proprietary information and/or constitutes RBC trade secrets," as follows:

> The drawing identified as RBC00017 contains the definitions forming the foundation for manufacturing a non-standard, specialized rod end used in a weapon system capable of operation in the extreme environments encountered in a marine, desert, tropical or freezing (arctic type) region. 

Ex. 15 to Sharp Aff., Doc. No. 128-13, at 5 (Interrogatory No. 1). RBC's interrogatory response identified specific engineering drawings, including the Raytheon Drawing and an RBC internal drawing illustrating additional manufacturing details concerning design features of the subject rod end that RBC contends, when combined, constitute its trade secret. Pl.'s Opp'n, Doc. No. 146, at 40-41. RBC's interrogatory response also referred to particular and explicitly-designated "Specifications," further identifying the design features RBC claims make up its trade secret design. *Id* at 41.

Now, at the summary judgment stage, RBC has elaborated on its description by explaining that the Raytheon Drawing portrays RBC's purportedly "unique [] loader slot rod end bearing design" containing a "novel combination of design features," including "a ███████ housing made of ██████ conditioned as H1025 to H1150, HRC 28-37, a ball made of ███ ██████ stainless steel, a ████████ on the ball OD and a ████████ ██████." *See* Pl.'s Opp'n, Doc. No. 146, at 37-38, 39.

As evinced by the record, RBC's description of its trade secret is not now nor has been vague, ambiguous, indefinite, nor a "moving target" that has inconsistently evolved as this case has progressed. RBC has presented a reliable explanation of its putative trade secret, and Multicut cannot credibly claim to lack notice of the basis of RBC's trade secret claims.

Accordingly, Multicut's effort to seek summary judgment for RBC's failure to define its putative trade secret with sufficient particularity is unavailing.[4]

2. *Genuine issues of material fact exist concerning whether the Raytheon Drawing contained trade secret information.*

Multicut further contends that the Raytheon Drawing did not contain any of RBC's trade secret information, but I agree with RBC that genuine issues of material fact preclude entry of summary judgment on that basis.

"A primary issue to be determined in all [trade secret] actions is whether there is a trade secret existing which is to be protected.'" *Plastic & Metal Fabricators, Inc. v. Roy*, 163 Conn. 257, 267 (1972); *see also Elm City Cheese Co. v. Federico*, 251 Conn. 59, 68 (1999). Under CUTSA, a "trade secret" is defined as:

> information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Conn. Gen. Stat. § 35-51(d); *see also* 18 U.S.C. § 1839(3) (articulating a materially similar standard). Thus, to be a trade secret, information must be: (1) of the kind included in the

---

[4] For this argument, Multicut marshals two distinguishable authorities: *Next Commc'ns, Inc. v. Viber Media, Inc.*, 758 F. App'x 46, 49 (2d Cir. 2018) (summary order); and *Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 257-60 (S.D.N.Y. 2014), *aff'd sub nom. Big Vision Priv. Ltd. v. E.I. du Pont de Nemours & Co.*, 610 F. App'x 69 (2d Cir. 2015). In both *Next Communications, Inc.* and *Big Vision Private, Limited*, the plaintiffs identified their purported trade secrets using vague descriptions and descriptors, the defendants solicited and obtained intervention of the court to order the plaintiffs to identify their respective trade secrets with specificity, the plaintiffs alternately and inconsistently identified the bases of their respective trade secret claims as the litigation had progressed, and the plaintiffs had continued to rely on vague and indefinite representations of their trade secrets even at the summary judgment stage. Moreover, Next Communications offered tens of potential bases for its trade secret claim and failed to identify the specific slides on which it ultimately argued its claim rested, and Big Vision's alleged trade secret required cross referencing its vague description against roughly seventy pages of dense scientific analysis set forth in multiple laboratory reports. Here, by contrast, RBC has consistently referenced a design, drawings portraying the design, and the specific part numbers embodying the design when identifying its alleged trade secret.

nonexhaustive list enumerated in the statute; (2) of independent economic value; and (3) the

subject of reasonable efforts to maintain its secrecy.  *Elm City Cheese Co.*, 251 Conn. at 78.

Whether information constitutes a "trade secret" is a question of fact.  *Elm City Cheese*

*Co.*, 251 Conn. at 68.  To determine whether information is a trade secret, salient factors include

those set forth in the commentary to section 757 of the Restatement of Torts:

> (1) the extent to which the information is known outside the business; (2) the
> extent to which it is known by employees and others involved in the business; (3)
> the extent of measures taken by the employer to guard the secrecy of the
> information; (4) the value of the information to the employer and to his
> competitors; (5) the amount of effort or money expended by the employer in
> developing the information; (6) the ease or difficulty with which the information
> could be properly acquired or duplicated by others.

*Town & Country House & Homes Service, Inc. v. Evans*, 150 Conn. 314, 318-19 (1963) (quoting

4 Restatement of Torts § 757, cmt. (b) (1939)).

a.   Relevant facts

RBC asserts, and Multicut disputes, that its trade secret is for the design of a loader slot

rod end bearing with a novel combination of materials and features for use in aircraft

applications with harsh environments, such as the wing assembly of Raytheon's SBD II.  RBC

claims without contradiction that the design was the result of the bearing design expertise of

RBC engineers, operating under McNeil, and that it has received two patents on the design.

Multicut says, though RBC disputes, that RBC's putative trade secret design is

substantially similar to a bearing publicly available in the New Hampshire Ball Bearings

("NHBB") sales catalog.  *See* Adam Dep. (part I), Ex. 11 to Sharp Aff., Doc. No 126-11, 113:3-

5, 183:1-2, 187:4-6; Adams Dep. (part II), Ex. 12 to Sharp Aff., Doc. No. 126-12, 65:25-66:25.

    b.  RBC's alleged trade secret is of the kind included in the nonexhaustive list enumerated in statute.

With respect to the first prong, there is no genuine issue regarding whether RBC's putative trade secret design solution for a loader slot rod end bearing, represented in a drawing, is information of the kind included in the non-exhaustive list set forth in Connecticut General Statutes section 35-51(d).

    c.  Whether RBC's putative trade secret design derives independent economic value from not being generally known is a genuine issue of fact.

With respect to the second prong, there are genuine issues of material fact concerning whether RBC's putative trade secret design is generally known and/or whether it uniquely and nonobviously combines known features, such that it derives independent value from not being generally known.

The parties do not dispute that the Raytheon Drawing discloses some individual features that are publicly known and not individually protectable.  Defs.' Mem., Doc. No. 131, at 30-31; Pl.'s Opp'n, Doc. No. 146, at 31-36; *see also Clearwater Sys. Corp. v. Evapco, Inc.*, 2005 WL 3543717, at *8 (D. Conn. July 26, 2005) (holding that information that is "well known by the public," "well known in the particular industry," or "ascertainable quickly and at little cost" are not trade secrets).  Rather, their dispute is directed to whether RBC's putative trade secret design employs a novel combination of materials and features and incorporates a unique or nonobvious combination of known features protectable by trade secrets.

An alleged trade secret "is not deprived of trade secret status simply because it is comprised of materials that are 'common [and] commercially available.'"  *Dreamcatcher Software Dev., LLC v. Pop Warner Little Scholars, Inc.*, 298 F. Supp. 2d 276, 282 (D. Conn. 2004) (quoting *Elm City Cheese Co.*, 251 Conn. at 74-75).  A "combination of characteristics

and components," even when its individual components are in the public domain, can constitute

a protected trade secret where "the unified process, design and operation of which, in unique

combination, affords a competitive advantage. . . ." *Imperial Chem. Indus. Ltd. v. National

Distillers and Chem. Corp.*, 342 F.2d 737, 742 (2d Cir. 1965); *see also Dreamcatcher Software

Dev., LLC* 298 F. Supp. 2d at 282 (quoting *Elm City Cheese Co., Inc.*, 251 Conn. at 75)

(providing that plaintiff's ability to "combine [publicly-known] elements into a successful

process, like the creation of a recipe from common cooking ingredients is a trade secret entitled

to protection").  At the same time, "design choices [that are] either obvious, widely known, easy

for others to discover legitimately or disclosed in the sales literature of [the plaintiff] or other

manufacturers" will not constitute a trade secret.  *Julie Rsch. Lab'ys, Inc. v. Select Photographic

Eng'g, Inc.*, 998 F.2d 65, 67 (2d Cir. 1993) (affirming district court decision, after a bench trial,

concluding that the plaintiff had failed to identify and prove alterations or configurations of off-

the-shelf components constituting proprietary or trade secret information).

      For Multicut to prevail on its motion for summary judgment on RBC's trade secret

claims, Multicut must establish that the evidence on this issue—as noted, a fact-intensive issue—

is "so one-sided that [Multicut] must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

Although Multicut repeatedly asserts that the Raytheon Drawing discloses a combination of

elements generally known within the industry and that were not unique, RBC challenges and

casts doubt on Multicut's claim by marshaling evidence in the summary judgment record.

*Compare* Pl.'s Opp'n, Doc. No. 146, at 31-36, *with* Def.'s Mem., Doc. No. 131, at 30-32.  I

address Multicut's contentions in turn, identifying the genuine issues that preclude summary

judgment.

One, drawing all inferences in RBC's favor as I must at summary judgment, a reasonable jury crediting the testimony of RBC's witnesses and drawing legitimate inferences from the summary judgment record could find that RBC designed an innovative rod end bearing for the SDB II project. McNeil testified without contradiction that RBC brought its design experience and technical expertise to bear to design, develop, and test a ███████████████ to solve Raytheon's significant problems with the ██████████████ for the SDB II project. *See* McNeil Dec., Doc. No. 150, ¶¶ 4-6. ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████ McNeil testified without contradiction that RBC considered a variety of design options and carefully selected among the options after rigorous review. *See* McNeil Decl., Doc. No. 150, ¶¶ 4-8. RBC's expert Dr. Robert Adams opined that he was unaware that RBC's putative trade secret design did not exist prior to McNeil's innovations and that its design was not, to the best of his knowledge, available for review or purchase from any publicly-available source at that time. Adams Decl., Doc. No. 151, ¶¶ 14-15. A jury crediting McNeil and Adams's testimony could find that RBC innovated on then-existing designs, selecting, in the unique context of a ████████████████ ██████, the following design features in combination: a harder ball with a softer body and no case hardening; a tougher housing material; a ██████████████ between the ball and housing; the specified maximum clearance of 0.0003; and ██████████ of the surface materials. *See generally* McNeil Dec., Doc. No. 150; Adams Dec., Doc. No. 151.

Two, although Multicut identifies a purportedly similar bearing, RBC has raised a genuine issue about whether the NHBB bearing combines elements in the same way as RBC's

putative trade secret design.  As Multicut's own expert Dr. Robert Bucinell testified, the NHBB

bearing is an insert or cartridge bearing, whereas the RBC bearing is a load slot bearing.  *See*

Bucinell Dep., Ex. 62 to Leddy Decl., Doc. No. 148-54, 128:10-19, 246:2-21.  The parties

disagree about the import of the distinction, but it is the province of a jury to resolve that

disputed issue.

Moreover, as RBC points out, none of Multicut, Multicut's expert, Raytheon, nor

Raytheon's expert has identified an extant loader slot rod end bearing design incorporating the

same combination of design features as RBC's putative trade secret.  *See* Dühring Dep., Ex. 9 to

Leddy Decl., Doc. No. 148-5, 71:20-72:3 (testifying that he was unaware whether a similar rod

end bearing was available via a catalog), 73:2-8 (testifying that he did not remember coming

across a catalog item identical to the rod end bearing portrayed in the Raytheon Drawing), 31:12-

20 (testifying that he understood that RBC's rod end bearing was ██████████████); Bucinell

Dep., Ex. 62 to Leddy Decl., Doc. No. 148-54, 254:12-262:2 (comparing the RBC bearing to the

distinguished NHBB bearing and failing to identify an identical bearing elsewhere); Remy Dep.,

Ex. 63 to Leddy Decl., Doc. No. 148-55, 206:18-207:21 (testimony of Raytheon employee

Christopher Remy that he was not aware of any rod end design that incorporated all of the RBC

putative trade secret design elements); Bealer Dep., Ex. 61 to Leddy Decl., II, Doc. No. 148-53,

75:5-76:13 (testimony of Raytheon employee Ian Bealer that "I don't believe we found one

specific bearing that had all of the requirements of the drawing."); Gordon Dep., Ex. 64 to Leddy

Dec, Doc. No. 148-56, 49:7-14; 55:11-56:15; 124:2-125:20 (testimony of Raytheon expert

Michael Gordon that he could "not recall" having seen a rod end design with all of the features

identified in the Raytheon Drawing).  In *Pawelko v. Hasbro, Inc.*, a case on which RBC relies,

the District of Rhode Island rejected a toymaker's effort to obtain summary judgment under its

theory that the plaintiff lacked a protectable trade secret where the elements of her toy concept were, the defendant argued, generally known to the public and the compilation of such elements was readily ascertainable. 2018 WL 6050618, at *1 (D.R.I. Nov. 19, 2018), *report and recommendation adopted*, 2019 WL 259117 (D.R.I. Jan. 18, 2019). There, the court reasoned that even though the defendant's expert had testified that the elements of the plaintiff's toy concept were widely-known, the expert's failure to identify a product combining all of the elements revealed a genuine issue of fact concerning the existence of a product combining the elements in the same manner as the plaintiff. *Id.* at *4. I agree with RBC that, in the instant case, the evidence presents a genuine issue of material fact whether there was an alternative loader slot rod end bearing design in the public domain that incorporated all of the elements of RBC's putative trade secret design when Multicut disclosed the design.

Furthermore, RBC persuasively buttresses its argument by identifying two patents awarded by the U.S. Patent and Trademark Office, the claims of which allegedly embody RBC's trade secret design, and the granting of which is evidence that RBC's proprietary design was not publicly known, readily ascertainable or obvious. Pl.'s Opp'n, Doc. No. 146, at 36 (citing Exs. 1 and 2 to Leddy Decl., Docs. No. 146-1 and 146-2). To be patentable as a matter of law, an invention must be novel and nonobvious (thus, not readily ascertainable). *See* 35 U.S.C. §§ 102, 103. Where a particular combination of features is used and the particular features are neither obvious nor easily duplicated, they may constitute a trade secret. *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990).

Three, although Multicut contends that the information in the Raytheon Drawing articulates "generic information" in the form of tolerance ranges and acceptance criteria, the argument misses the mark. *See* Defs.' Mem., Doc. No. 131, at 30-31. Protectable trade secrets

41

can be embodied in engineering drawings and blueprints representing the dimensions and

tolerances of devices.  *See*, *e.g.*, *Forro Precision, Inc. v. Int'l Bus. Machines Corp.*, 673 F.2d

1045, 1057 (9th Cir. 1982).  *Cf. Norbrook Lab'ys v. G.C. Hanford Mfg. Co.*, 2003 WL 1956214,

at *3 (N.D.N.Y. Apr. 24, 2003) (concluding that a trade secret is defined in a sufficiently

particularized manner where "more than one combination" of the factors will yield equally

acceptable outcomes).

     Four, Multicut points to the fact that the Raytheon Drawing is a vendor item control

drawing.  To Multicut, because a vendor item control drawing by definition cannot represent a

complete design disclosure, and nothing about the drawing indicates that it should be treated

differently from any other vendor item control drawing, this uncontested fact is dispositive.

Defs.' Mem., Doc. No. 131, at 31-32.  As a factual matter, there is no dispute that the Raytheon

Drawing was indeed labeled a "vendor item control drawing."  Def.'s SOF, Doc. No. 132, ¶¶ 13,

18; Raytheon Drawing, Ex. B to Dühring Aff., Doc. No. 127-2.  According to the American

Society of Mechanical Engineers, a vendor item control drawing provides "an engineering

description and acceptance criteria for commercial items or vendor-developed items that are

procurable from a specialized segment of industry" and "sufficient engineering definition for

acceptance of interchangeable items within specified limits."  *Id.* ¶ 15; ASME Y14.24-2012, Ex.

7 to Sharp Aff., Doc. No. 126-7, §§ 10.2.1, 10.2.2.3.  Although RBC introduces numerous

counterarguments, *see* Pl.'s Opp'n, Doc. No. 146, at 42-44, I think RBC overcomplicates the

issue.  Simply stated, that the Raytheon Drawing was labeled a vendor item control drawing is

perhaps evidence from which a reasonable jury could draw a legitimate inference that the

Raytheon Drawing did not contain trade secret information.  But the fact that the Raytheon

Drawing was labeled a vendor item control drawing hardly places the question of whether the

drawing contained trade secret information beyond dispute.  *See also Anderson*, 477 U.S. at 255 (providing that "the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

Five, Multicut asserts that the Raytheon Drawing sets broad parameters conducive to a variety of rod end solutions, which cannot constitute trade secret information and does not disclose the information necessary to manufacture the exact rod end bearing that RBC produced. Defs.' Mem., Doc. No. 131, at 22 n.5, 31 (citing Adams Dep., Ex. 9 to Sharp Aff., Doc. No. 128-7, 24:5-26:5 (describing an absence of dimensions necessary for the load slot in the Raytheon Drawing)).  RBC, by contrast, contends that the drawing indeed discloses sufficient information to allow another company to manufacture an interchangeable rod end bearing with the rod end bearing produced by RBC.  Pls.' SOF, Doc. No. 147, ¶ 37 (citing McNeil Decl., Doc. No. 150, ¶ 44 (asserting same); Adams Decl., Doc. No. 151, ¶ 26 (same)).  RBC asserts that its competitor ultimately awarded the contract for rod end bearings ultimately used the Raytheon Drawing to make a rod end using RBC's putative trade secret design.  *See* Duhring Dep., Ex. 9 to Leddy Decl., Doc. No. 148-5, 338:7-17.  This fact is clearly subject to dispute.

Finally, a reasonable jury could infer from the premium price RBC charged for the Rod End that the product embodied a trade secret.

Accordingly, I cannot conclude that whether RBC's putative trade secret design derives independent economic value from not being generally known is an issue so one-sided that it compels judgment as a matter of law in Multicut's favor.

      d.  Whether RBC took reasonable steps to protect the secrecy of its alleged trade secret is a genuine issue of material fact.

With regard to the third prong, there are also genuine issues of material fact concerning whether RBC undertook reasonable efforts to maintain the secrecy of its putative trade secret design.

Connecticut General Statutes section 35–51(d)(2) requires that information sought to be protected be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Conn. Gen. Stat. § 35-51(d)(2). "Reasonable precautionary measures for maintaining the secrecy of information [are] all that [is] required." *Elm City Cheese Co. v. Federico*, 251 Conn. 59, 86 (1999) (cleaned up). Reasonable efforts include but are not limited to "requiring employees to sign confidentiality agreements or otherwise advising them of the confidential nature of the process; . . . placing legends on documents; taking precautions regarding visitors [and third parties], by requiring them to sign confidentiality agreements, having them sign in, and shielding the process from their view; segregating information, so that no one person or written source discloses the entire manufacturing process; and using unnamed or coded ingredients." *Id.* at 79 (citation omitted).

Whether a party has made reasonable efforts to maintain the secrecy of a putative trade secret is question of fact and "a highly fact-specific inquiry." *Id.* at 80. Nevertheless, summary judgment may enter where "no reasonable factfinder could find that [the plaintiff] undertook reasonable efforts to maintain the secrecy of its alleged trade secret. *Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 269 (S.D.N.Y. 2014), *aff'd sub nom. Big Vision Priv. Ltd. v. E.I. du Pont de Nemours & Co.*, 610 F. App'x 69 (2d Cir. 2015) (granting summary judgment where the plaintiff had disclosed its purported trade secret information to sixteen third

parties, at least once without any effort whatsoever to maintain the confidentiality of its information).

RBC identifies thirteen actions it took prior to Multicut's alleged disclosure to protect its trade secret. *See* Pl.'s Opp'n, Doc. No. 146, at 45-46 (internal citations omitted). From the following facts supported by the record, a reasonable jury could draw a legitimate inference that RBC protected its putative trade secret information by taking reasonable steps to prevent gratuitous disclosure. One, RBC required employees to sign standard employment agreements containing confidentiality provisions and trained employees on identifying and maintaining trade secrets. Ex. 71 to Leddy Decl., Doc. No. 148-62; Giuntoli Dep., Ex. 72 to Leddy Decl., Doc. No. 148-63, 40:23-43:8 (part I), 83:20-84:7 (part II); Giuntoli Decl., Doc. No. 149, ¶ 6; McNeil Decl., Doc. No. 150, ¶ 35; McNeil Dep., Ex. 59 to Leddy Decl., Doc. No. 148-51, 74:16-75:4 (part I). Two, RBC's interactions with third parties reflect steps to protect its intellectual property. RBC's standard terms of sale expressly state that RBC retains all intellectual property rights related to its products. Ex. 21 to Leddy Decl., Doc. No. 142-21 at 5; Giuntoli Decl., Doc. No. 149, ¶ 17. RBC entered into nondisclosure agreements with Raytheon, Klune, and Multicut. Exs. 8, 12, and 18 to Leddy Decl., Docs. No. 142-8, 148-8, 142-18; Giuntoli Decl., Doc. No. 149, ¶¶ 7, 10, 16. RBC's McNeil shared his marked-up drawing with Raytheon with the notation ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ referring to the Raytheon-RBC PIA, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 10 to Leddy Decl., Doc. No. 148-6; McNeil Decl., Doc. No. 150, ¶ 7. RBC likewise required that Multicut enter into the MCA before shipping Multicut sample rod ends bearings. Ex. 17 to Leddy Decl., Doc. No. 148-12. Four, RBC indicated alarm concerning the potential for disclosure of its trade secret information in the Multicut RFQ, investigated the potential disclosure, and notified Multicut via

Giuntoli's July 2, 2017 email that Multicut may have disclosed its confidential information. Exs. 39-41 to Leddy Decl., Docs. No. 148-31, 148-32, and 148-33; Giuntoli Decl., Doc. No. 149, ¶¶ 24-26.

Multicut encourages me to decide this issue on the basis that after RBC learned that Multicut had included the Raytheon Drawing in its RFQ to third parties, Multicut contends, RBC "took no steps to prevent or mitigate the potential for further disclosures." Defs.' Mem., Doc. No. 131, at 33 (citing Def.'s SOF, Doc. No. 132, ¶¶ 48-52, 61-62 and *Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224 (S.D.N.Y. 2014)). Multicut emphasizes that RBC did not demand that Multicut recall copies of the Raytheon Drawing from the third parties, demand that Multicut refrain from additional disclosures, expressly identify the Raytheon Drawing as a document representing any of its trade secret information, or object to Duhring's July 4, 2017 email. *Id.* I agree that from this information, a reasonable jury could determine that RBC did not act with urgency to protect its trade secrets. *But see FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) ("A trade secret once lost is, of course, lost forever."). Nevertheless, in light of the ample and well-supported evidence that RBC sought to protect its trade secret information prior to the alleged disclosure, the issue of RBC's reasonable efforts to maintain the secrecy of its putative trade secret is neither beyond dispute nor ripe for resolution at summary judgment.

Accordingly, I cannot conclude that this issue is so one-sided that it compels judgment as a matter of law in Multicut's favor.

Taken together, there are genuine issues of material fact concerning whether RBC's putative trade secret design derives independent economic value from not being generally known, and summary judgment in favor of Multicut on Counts Two and Three will not enter.

3. *Genuine issues of material fact exist concerning whether Multicut had notice that the Raytheon Drawing contained trade secret information.*

Multicut next argues that it is not liable for the misappropriation of any RBC trade secret allegedly contained in the Raytheon Drawing because it did not know or have reason to know that the Raytheon Drawing contained any RBC trade secrets. Defs.' Mem., Doc. No. 131, at 20 (citing Defs.' SOF, Doc. No. 132, ¶¶ 1-4, 36, 44). I disagree.

Under CUTSA, misappropriation is defined in relevant part as:

(2) disclosure or use of a trade secret of another without express or implied consent by a person who. . . , (B) at the time of disclosure or use, *knew or had reason to know* that his knowledge of the trade secret was . . . (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Conn. Gen. Stat. § 35-51(b); *see also* 18 U.S.C. § 1839(5).

Multicut marshals compelling evidence for its claim that none of the information available to it suggested that the Raytheon Drawing contained any of RBC's trade secret information. One, the Raytheon Drawing itself did not explicitly indicate that it contained any RBC trade secret information. The drawing was marked "RAYTHEON PROPRIETARY," contained Raytheon's exclusive CAGE code, was designated a vendor item control drawing, listed RBC as one "suggested source," and contained specifications permitting a range of potential design solutions. Defs.' Mem., Doc. No. 131, at 21-23 (citing Defs.' SOF, Doc. No. 132, ¶¶ 13, 17). Two, Raytheon, which furnished the drawing to Multicut, allegedly did not give Multicut cause to know that the drawing contained RBC's putative trade secret. When Multicut acquired the drawing from Raytheon, Multicut represents, Raytheon did not inform Multicut of interactions between Raytheon and RBC in connection with the development of the Rod Ends or the Raytheon Drawing, nor give Multicut documents containing information related to those

interactions.  *Id.* at 23 (citing Def.'s SOF, Doc. No. 131, ¶¶ 1-4, 7-8, 9-10).  Multicut also

identifies assurances from Raytheon that Raytheon was the "legal and rightful owner of the

design" and that the drawing was "proprietary to" Raytheon.  *Id.* at 26.

Moreover, much of the evidence that RBC contends supports an inference that Multicut

should have known that RBC claimed ownership of the rod end bearing design as its trade secret

is not persuasive or is disputed.  *See* Pl.'s Opp'n, Doc. No. 146, at 26-28 (citing *PFS Distribution*

*Co. v. Raduechel*, 395 F. Supp. 2d 779, 786 (S.D. Iowa 2005), for the proposition that "even

assuming the Bank did not have actual knowledge of where [defendants] obtained their

information, the statute holds individuals and entities accountable for situations where the person

"has reason to know of the information or circumstance.")).  For example, RBC invokes the

highly confidential context of the SDB II project, for which RBC and Raytheon had entered into

a nondisclosure agreement in 2014, pursuant to which RBC had shared its proprietary design in

drawing hand-marked confidential and subject to the proprietary information agreement.  *Id.* at

26-27.  This evidence, of which Multicut disputes having knowledge, perhaps supports an

inference that Multicut knew or should have known it was obligated to keep information that

Raytheon shared confidential, but it hardly establishes that the Raytheon Drawing contained

RBC's trade secret information.  *See* Def.'s Mem., Doc. No. 131, at 23.

Ultimately, however, I conclude that a reasonable jury could find that Multicut was on

notice that the Raytheon Drawing contained RBC's putative trade secret, which precludes entry

of summary judgment in Multicut's favor.  Multicut characterizes the record as demonstrating

repeated failures by RBC to follow up on contemporaneous inquiries concerning Multicut's use

of the Raytheon drawing.  For example, two months after Multicut disclosed the Raytheon

Drawing to potential bidders, Giuntoli wrote Dühring to say that The "product design and the

product drawing is proprietary to RBC Bearings" and that Multicut "may have provided [competitors] with [] critical information concerning RBC's design, drawing, and/or specifications."  Def's SOF, Doc. No. 132, ¶ 53.  Dühring responded to indicate that he "fe[lt] urged to stress" that he hadn't "violated any NDR nor conducted any misappropriation of RBC's intellectual property."  *Id.* ¶ 56.  RBC did not reply until it filed the instant lawsuit over a year later.  *Id.* ¶¶ 57, 60-62.[5]  But notice is a fact question, and a reasonable jury could find that the Giuntoli email put Multicut on notice that the Raytheon Drawing— which it passed to third-parties in the Multicut RFQ— contained an RBC trade secret.  Thereafter, Multicut could not continue to use RBC's putative trade secret design for its own benefit without the risk of incurring liability for doing so.  *See Conmar Products Corp. v. Universal Slide Fastener Co.*, 172 F.2d 150, 156-57 (2d Cir. 1949).

In sum, genuine issues of material fact exist regarding RBC's trade secret claims, and I deny Multicut's motion for summary judgment on Counts Two and Three.

C.  Counts Four, Five, Six, Nine, Ten, and Eleven: State Law Claims

Multicut contends, and RBC disputes, that Counts Four (tortious interference with prospective contractual relations), Five (fraudulent inducement), Six (CUTPA), Nine (unjust enrichment as to MNA), Ten (promissory estoppel as to MNA), and Eleven (unjust enrichment as to Multicut A/S) assert claims based in tort, restitution, or statute that exclusively rely on the alleged misappropriation of RBC's trade secrets as the basis for liability; thus, they are

---

[5] Multicut further argues that it did not misappropriate any trade secret allegedly in the Raytheon Drawing on the basis that it did not acquire the Raytheon Drawing by "improper" means, within the meaning of the statutes.  Defs.' Mem., Doc. No. 131, at 27 (citing Defs.' SOF, Doc. No. 132, ¶¶ 9-16) (arguing that it is undisputed that Multicut acquired the Raytheon Drawing via Raytheon's voluntary disclosure of the drawing for the purposes of preparing a quote for the supply of the Wing Assembly).  RBC appears to waive this argument, and I do not address it.

preempted by the Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. § 35-57(a), and are not independently actionable.

Connecticut General Statutes section 35-57(a) provides that "unless otherwise agreed by the parties, [CUTSA] supersede[s] any conflicting tort, restitutionary, or other law of this state pertaining to civil liability for misappropriation of a trade secret." Conn. Gen. Stat. § 35-57(a). CUTSA, however, does not preempt "[c]ontractual or other civil liability or relief that is not based on misappropriation of a trade secret." *Id.* § 35-57(b).

No Connecticut appellate court has addressed the nature and extent of CUTSA preemption. On the one hand, courts have concluded that CUTSA may preempt a common law or statutory claim predicated on a breach of "duties imposed by law in order to protect competitive secret trade information." *On-Line Techs., Inc. v. Perkin-Elmer Corp.*, 253 F. Supp. 2d 313, 334 (D. Conn. 2003); *accord Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 751 (2d Cir. 1998) (affirming district court's dismissal of alternative tort claims premised on misuse of trade secrets as preempted by CUTSA); *Milso Indus. Corp. v. Nazzaro*, 2012 WL 3778978, at *8 n.3 (D. Conn. Aug. 30, 2012). On the other hand, where a cause of action does not conflict with CUTSA or the claim "rest[s] on allegations broader than a simple misappropriation of trade secrets," Connecticut courts have concluded that CUTSA will not preempt the cause of action. *Peak Wellness, Inc. v. Green*, 2009 WL 10715485, at *1 (D. Conn. Jan. 23, 2009); *see also Nat'l Waste Assocs., LLC v. Scharf*, 2015 WL 7421645, at *5 (Conn. Super. Ct. Oct. 29, 2015), *aff'd*, 183 Conn. App. 734 (2018) ("[T]o survive, [the plaintiff's tort claims] must turn on some wrong other than the misappropriation of trade secrets.").

To evaluate whether CUTSA conflicts with a cause of action, courts look to the pleadings. However, when there are genuine issues of material fact regarding the existence

and/or misappropriation of a trade secret, then the court will not resolve the preemption issue at summary judgment. *See Panterra Engineered Plastics, Inc. v. Transportation Sys. Sols., LLC,* 2008 WL 877003, at *3 (D. Conn. Mar. 27, 2008) ("The Court does not need to decide the preemption issue because there are genuine issues of material fact regarding Panterra's assertion that it possessed trade secrets and that the defendants misappropriated them. If Panterra fails to prove its assertion, thereby failing to prove a violation of CUTSA, Panterra may then seek relief pursuant to its common law causes of action.").

1. *Count Four (Tortious Interference with Prospective Contractual Relations)*

In Count Four, RBC alleges that Multicut tortiously interfered with prospective contractual relations between RBC and Raytheon.

The parties marshal conflicting authorities directed to whether, and to what extent, CUTSA may preempt a tortious interference claim. For its part, Multicut points to a decision of this Court holding that a tortious interference claim that exclusively relies on misappropriation of trade secrets for the basis of liability can be preempted by CUTSA. *See Nat'l Waste Associates, LLC v. Scharf*, 2015 WL 7421645, at *5, *aff'd*, 183 Conn. App. 734 (2018) (advising that "tortious interference and other claims must turn on some wrong other than the misappropriation of trade secrets" to avoid CUTSA preemption"). RBC relies on a decision contrastingly determining that CUTSA "provides a remedy for those who are damaged by another's interference with a business relationship and does not define substantive trade secret rights," such that CUTSA will not preempt a trade secret plaintiff's tortious interference claim. *See Mushroom Tray Rsch. Grp. v. Nobile*, 2000 WL 1023448, at *3 (Conn. Super. Ct. Apr. 28, 2000).

Here, I agree with RBC that its tortious interference claim more than repeats its trade secrets claims and that the claims do not "conflict" within the meaning of CUTSA. RBC alleges that Multicut misappropriated its trade secrets and confidential information to "find a cheaper supplier and remove RBC as the Raytheon rod end bearings supplier," covered up references to RBC on the Raytheon Drawing, and pretextually appeared to negotiate a long-term supply agreement to placate RBC and dissuade it from pursuing litigation. SAC, Doc. No. 75, at ¶¶ 137-49.[6] Incorporating these additional allegations concerning Multicut's "ulterior motives and bad behavior," RBC's tortious interference claim is broader than its trade secret claim. Pl.'s Opp'n, Doc. No. 146, at 48. Therefore, RBC's tortious interference claim does not exclusively rely on misappropriation of trade secrets as its basis for liability, and it is independently actionable.

Because Multicut has not set forth a valid basis for summary judgment on RBC's tortious interference claim, I deny Multicut's motion for summary judgment on Count Four.

### 2. *Count Five (Fraudulent Inducement)*

In Count Five, RBC alleges that Multicut's fraudulent actions resulted in or furthered the misappropriation of RBC's trade secrets.

Fraud claims based on the theory that the defendant's purportedly fraudulent actions induced the plaintiff to disclose its trade secrets are preempted by CUTSA. *See On-Line Tech. v. Bodenseewerk Perkin-Elmer*, 386 F.3d 1133, 1145 (Fed. Cir. 2004).

---

[6] Under Connecticut law, "[a] claim for intentional interference with contractual relations requires the plaintiff to establish: (1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that the interference was tortious; and (5) a loss suffered by the plaintiff that was caused by the defendant's tortious conduct." *Rioux v. Barry*, 283 Conn. 338, 351 (2007) (citations omitted).

Here, I agree with Multicut that RBC's fraudulent inducement claim merely repeats its trade secrets claim and that the claims thus "conflict" within the meaning of CUTSA. RBC alleges that Multicut "entered into the [MCA], gave the appearance of negotiating a long-term supply contract with RBC" without any intention of entering into a long-term supply contract with RBC, and entered a small order of rod end bearings "in order to deceive RBC and to induce RBC into turning over access to its proprietary information and trade secrets." SAC, Doc. No. 75, at ¶ 156.

In a case in which a plaintiff made similar allegations, this court determined (and the Federal Circuit affirmed) that CUTSA preempted the plaintiff's claim. *See On-Line Tech., Inc. v. Perkin-Elmer Corp.*, 253 F. Supp. 2d 313 (D. Conn. 2003), *aff'd sub nom.*, *On-Line Tech. v. Bodenseewerk Perkin-Elmer*, 386 F.3d 1133, 1145 (Fed. Cir. 2004). There, the plaintiff alleged that the defendants had employed "the 'ruse' of a possible joint venture" to access the plaintiff's trade secrets, and this Court concluded that the plaintiff's claim was "built on the theory that the two alleged fraudulent actions resulted in or furthered misappropriation of trade secrets." *Id.* at 334. Thus, the claim merely alleged "breach of 'duties imposed by law in order to protect competitively secret trade information,' Commissioner's Comment to UTSA § 7, and do not go beyond a 'tort, restitutionary or other law of this state pertaining to civil liability for misappropriation of a trade secret,' § 35–57(a)." *Id.* Here, it is facially apparent that, at its core, RBC's fraudulent inducement claim seeks redress for Multicut's alleged misrepresentation of its trade secrets. Thus, the reasoning of *On-Line Technologies, Inc.* applies on all-fours to the case at bar.

However, genuine disputes of material fact exist regarding whether Multicut misappropriated RBC's putative trade secret design. If RBC fails to prove that Multicut violated

CUTSA, then its fraudulent inducement claim would not be preempted by CUTSA and RBC could seek relief via a common law claim. Therefore, I deny Multicut's motion for summary judgment on Count Five.

   3.   *Count Six (CUTPA)*

In Count Six, RBC alleges that Multicut violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110(g).

The Connecticut Unfair Trade Practices Act ("CUTPA") provides in relevant part: "Any person who suffers any ascertainable loss of money or property . . . as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages. . . . The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper." Conn. Gen. Stat. § 42-110g(a).

No Connecticut appellate court has addressed whether CUTSA preempts CUTPA claims premised on CUTSA violations. RBC relies on decisions in which the Connecticut Superior Court distinguished the legislative purposes of CUTSA and CUPTA and concluded that the Uniform Trade Secrets Act "provides a parallel remedy" such that a plaintiff may maintain causes of action under both statutes. *See*, *e.g.*, *Mushroom Tray Rsch. Grp. v. Nobile*, 2000 WL 1023448, at *2 (Conn. Super. Ct. Apr. 28, 2000) (collecting cases). Multicut, by contrast, asserts that CUTSA preemption "bars any non-contractual claim grounded in the same set of facts as a trade secret claim." Defs.' Mem. of Law, Doc. No. 131, at 35. Although I agree with RBC that Multicut's characterization of the law is overbroad, Connecticut courts have indeed concluded that CUTSA preempts CUTPA claims that conflict with the trade secrets law. *See, e.g., On-Line Tech.*, 253 F. Supp. at 334-35 (dismissing as preempted a CUTPA claim that merely "restate[d]"

54

the plaintiff's CUTSA allegations and "consequences that flow inexorably from virtually every CUTSA violation"). But I do not need to resolve this issue now for two reasons.

One, RBC alleges that Multicut violated CUTPA by misappropriating RBC's trade secrets and engaging in "aggravated circumstances" including but not limited to intentionally interfering with RBC's prospective relationship with Raytheon. *See* SAC, Doc. No. 75, at ¶¶ 162-71. As I have already explained, RBC's allegations of tortious interference are distinct from its allegations of misappropriation. To the extent that RBC's CUTPA claim rests on a claim of tortious interference, it would not be preempted by CUTPA.

Two, genuine disputes of material fact exist regarding whether Multicut misappropriated RBC's putative trade secret design. To the extent that RBC's CUTPA claim rests on allegations of misappropriation of trade secrets, then, the claim is not ripe for resolution at summary judgment. Moreover, if RBC fails to prove that Multicut violated CUTSA, then its CUTPA claim would not be preempted by CUTSA. *See Panterra Engineered Plastics*, 2008 WL 877003 at \*3.

Because Multicut has not set forth a valid basis for summary judgment on RBC's CUTPA claim and because there are disputed issues of material fact, I deny Multicut's motion for summary judgment on Count Six.

4. *Count Nine (Unjust Enrichment, against MNA) and Eleven (Unjust Enrichment, against Multicut A/S)*

In Counts Nine and Eleven, RBC alleges that MNA and Multicut A/S, respectively, were unjustly enriched as a result of their "misappropriation and continued unlawful disclosure of RBC trade secrets and confidential information." SAC, Doc. No. 75, at ¶¶ 189, 203.

Although CUTSA preempts claims for unjust enrichment that seek to recover damages based on the alleged misappropriation of trade secrets, *see Nat'l Waste Assocs.*, 2015 WL 7421645, *5, genuine disputes of material fact exist regarding whether Multicut misappropriated RBC's putative trade secret design. If RBC fails to prove that Multicut violated CUTSA, then its unjust enrichment claims would not be preempted.

Because Multicut has not set forth a valid basis for summary judgment on RBC's unjust enrichment claims, I deny Multicut's motion for summary judgment on Counts Nine and Eleven.

### 5. *Count Ten (Promissory Estoppel, against MNA)*

In Count Ten, RBC alleges that "on or about February 13, 2017," the date when MNA signed the MCA, "MNA made a clear and definite promise to RBC that it would keep and treat confidentially all of RBC's Confidential Information, including RBC trade secrets, that were directly and/or indirectly disclosed, provided and furnished in connection with the evaluation of a proposed transaction whereby RBC would be the exclusive supplier of the rod end bearings for Raytheon's SDB II project" and that MNA broke that promise when it "unlawfully used and disclosed RBC's Confidential Information and trade secrets to RBC's competitors." SAC, Doc. No. 75, at ¶¶ 192-98. Multicut contends that RBC's promissory estoppel claim is preempted by CUTSA because it is nothing more than a restitutionary claim that rests entirely on the same facts as RBC's trade secret misappropriation claims.

CUTSA may preempt a claim for restitution that seeks to recover damages based on the alleged misappropriation of trade secrets, *see Am. Ctr. for Excellence in Surgical Assisting Inc. v. Cmty. Coll. Dist.*, 502, 190 F. Supp. 3d 812, 826 (N.D. Ill. 2016) (holding that analogous UTSA preemption provision barred promissory estoppel claim which "restates the claim for misappropriation of trade secrets"), but genuine disputes of material fact exist regarding whether

Multicut misappropriated RBC's putative trade secret design.  If RBC fails to prove that Multicut violated CUTSA, then its promissory estoppel claim would not be preempted.

Moreover, as set forth *supra*, I have denied summary judgment in favor of Multicut on RBC's breach of contract claim.  I cannot yet conclude that no reasonable jury could find that RBC can state a breach of contract and/or implied covenant claim based on Multicut's alleged breach of the MCA.  For the same reasons, I cannot conclude that no reasonable jury could find that RBC can state a claim for promissory estoppel based on MNA's specific and definite promise in the MCA, as RBC expressly pleads, to keep confidential information covered by the parties' agreement.

Because Multicut has not set forth a valid basis for summary judgment on RBC's promissory estoppel claim, I deny Multicut's motion for summary judgment on Count Ten.

### D.  Count Eight (Declaratory Judgment)

In Count Eight, RBC seeks a declaratory judgment that the designs, drawings, pricing data and all other related documents relating to the proprietary rod end bearings designed by RBC are the trade secrets of RBC protected under both the DTSA and CUTSA.  SAC, Doc. No. 75, ¶¶ 180-85.

"In a case of actual controversy within its jurisdiction" and within its discretion, a district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a); *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) ("substantial discretion").  The Second Circuit recently emphasized district courts' substantial discretion to "decline jurisdiction upon the application of an open-ended, multi-factor balancing test in which no one factor necessarily mandates an exercise of jurisdiction" and articulated several non-dispositive and non-exhaustive

factors to guide whether a district court should or should not exercise its discretion in reviewing

a claim for a declaratory judgment:

> (1) whether the [declaratory] judgment [sought] will serve a useful purpose in clarifying or settling the legal issues involved; (2) whether [such] a judgment would finalize the controversy and offer relief from uncertainty; (3) whether the proposed remedy is being used merely for procedural fencing or a race to *res judicata*; (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; (5) whether there is a better or more effective remedy; . . . and (6) whether concerns for judicial efficiency and judicial economy favor declining to exercise jurisdiction

*Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 89, 99-100 (2d Cir. 2023) (citing

*Niagara Mohawk Power Corp. v. Hudson River-Black River Regul. Dist.*, 673 F.3d 84, 105 (2d

Cir. 2012) (cleaned up)).

Multicut moves for summary judgment on Count Eight, arguing that the claim is

duplicative of RBC's other claims and not independently actionable.  Defs.' Mot., Doc. No. 124,

at 2; Defs.' Mem., Doc. No. 131, at 38 n.9.  RBC contends that declaratory judgments are typical

and warranted concerning claims regarding ownership rights in trade secrets.  Pl.'s Opp'n, Doc.

No. 146, at 47 n.15.

I conclude that Multicut has not set forth a valid basis for judgment as a matter of law on

RBC's declaratory judgment claim at this time, and I deny its motion for summary judgment on

the claim without prejudice to Multicut reasserting its argument at a later stage of litigation.

## IV.   Conclusion

For the foregoing reasons, Multicut's motion for summary judgment (doc. no. 124) is

**denied**.  All of RBC's claims remain for trial.  Jury selection has been scheduled for January 24,

2024, with the trial to begin immediately thereafter.

Within **fourteen days** of this order, the parties shall file a joint status report indicating whether they request a referral to a United States Magistrate Judge for settlement purposes.

So ordered.

Dated at Bridgeport, Connecticut, this 29 day of September 2023.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge